UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM VINCENT ROMERO, <br><br> Petitioner, <br><br> v. <br><br> SCOTT KERNAN, Secretary of the California Department of Corrections and Rehabilitation, et al., <br><br> Respondent. | Case No.: 14cv1284-GPC(BLM) <br><br> **REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** <br><br> **[ECF No. 65]** |

This Report and Recommendation is submitted to United States District Court Judge Gonzalo P. Curiel pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California. On May 20, 2014, Petitioner William Vincent Romero, a state prisoner who is proceeding *pro se* and *in forma pauperis*, commenced these habeas corpus proceedings pursuant to 28. U.S.C. § 2254. ECF No. 1 ("Pet."). On October 4, 2017, Mr. Romero filed a First Amended Petition for Writ of Habeas Corpus. ECF No. 65 ("FAP"). Petitioner challenges his convictions for second degree murder, gross vehicular manslaughter, driving under the influence causing injury, driving with a .08 blood alcohol level or higher causing injury, and hit and run with death or permanent serious injury. FAP at 2; <u>see also</u> ECF No. 71-1 ("Answer") at 9 and Lodgment 34. Respondent answered the FAP on January

29, 2018.  ECF No. 71.  Petitioner filed a traverse on February 11, 2018.  ECF No. 76.

This Court has considered the FAP, Answer, Traverse, and all supporting documents filed by the parties.  For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the California Court of Appeal's opinion in <u>People v. Romero</u>, 2013 WL 1808701 (Cal. Ct. App. April 30, 2013):

On Easter day in 2010, Romero went to a party at the home of his ex-wife, Christina Gold. When Romero arrived at Gold's home between 2:00 and 3:00 p.m., he was already intoxicated. Romero had tequila and some beer while at the party. He made a comment to Gold that if he drove, someone was going to die that night. After Romero became loud and belligerent, Gold told him to "crash on the couch." Romero vomited several times.

Romero's daughter, Victoria Shacreaw, left the party around 5:00 p.m. and returned two hours later. Romero was asleep while Shacreaw was gone. Around 7:30 p.m., Romero stated to Shacreaw, "If I drive right now either I'm gonna die or some innocent's gonna die." At 8:40 p.m., neighbors came to the house and said they were going to have Romero's car towed because it was in their driveway. Shacreaw asked Romero for his keys in order to move the car, but Romero pushed her and the neighbors out of the way and took off. As Romero was running down the stairs, Shacreaw told him to give her the keys because he was too drunk to drive.

Romero's son, Nicholas, was also at the party that day. Nicholas left the party in the afternoon and returned to the home that he shared with his father. Around 9:00 p.m. that night, Nicholas heard Romero's Camaro pull into the driveway. When Nicholas went outside to Romero's car, Romero was sitting in the driver's seat talking on the phone. Romero drove away around 10:00 p.m.

Shortly before midnight, Robert Houston was driving southbound on Interstate 5 near San Onofre when he looked in his rearview mirror and saw a sports car approaching him very fast. The sports car was traveling at approximately 100 miles per hour and recklessly changing lanes. Other witnesses also observed a dark Camaro traveling at a high rate of speed and recklessly moving across lanes of traffic. The Camaro then hit the rear end of a Ford Explorer, causing the Explorer to spin and hit the guardrail.

Lopez, Sr., and his son, Oscar Lopez, Jr., were thrown out of the Explorer. Lopez, Sr. died from his injuries and Lopez, Jr., who was found lying on the northbound side of the freeway, suffered a laceration on his head that required staples to

repair. Two other passengers did not sustain any injuries requiring treatment.

When Officer Mark Keyes and his partner arrived at the site of the accident, they received information that the driver of the Camaro had fled the scene. The officers spotted Romero walking along a frontage road next to the freeway. Romero darted down a trail towards the beach. Border Patrol agents found Romero lying in the brush. Although agents did not mention the crash, Romero immediately stated that he was not the driver of the vehicle. He claimed the driver was a man named "Ted," who he met at Lucky John's bar in Fullerton that night. Romero told officers that he was drinking beers with Ted at the bar and later, in a nearby park.

Romero's blood was drawn at a hospital. His DNA matched DNA from blood samples taken from the driver's side airbag in the Camaro and a metal guardrail. When Romero's blood was drawn at 2:05 a.m., his blood alcohol level was .10 percent. Jorge Pena, a criminalist with the San Diego County Sheriff's Crime Laboratory, testified that based on a normal rate of elimination, Romero's blood alcohol level at the time of the crash was between .125 and .145 percent. Pena explained that because of the "Mellanby effect," a person feels the effects of alcohol more during intake than during the time the body is eliminating alcohol from the system.

Lodgment 5 at 2-4.[1]

On September 6, 2011, the People of the State of California filed an amended information charging Petitioner with murder, gross vehicular manslaughter while intoxicated, vehicular manslaughter - non alcohol-gross negligence - unlawful manner, driving under the influence causing injury, driving with a measurable blood alcohol causing injury, and hit and run with death or permanent serious injury. Lodgment 34 at 7-10. Following a trial, the jury found Petitioner guilty of second degree murder, gross vehicular manslaughter while intoxicated, driving under the influence causing injury, driving with a .08 blood alcohol level or higher causing injury, and hit and run with death or permanent serious injury. Id. at 214-218. The jury also found true that Petitioner fled the scene of the crime and personally inflicted great bodily injury upon a person. Id. The trial court found that Petitioner had a prior conviction and one prison

---

[1] This Court presumes the state court's factual determinations to be correct absent clear and convincing evidence to the contrary. 28 U.S.C § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Parke v. Raley, 506 U.S. 20, 35 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

prior.  Id. at 378.  Petitioner was sentenced to fifteen years to life plus one year.  Id. at 334, 381; see also Lodgment 11.

Petitioner appealed his conviction, arguing that (1) the record lacked sufficient evidence to sustain a conviction for implied malice murder and (2) his convictions for driving under the influence and causing injury and driving with a .08 blood alcohol level or higher and causing injury had to be reversed as they were lesser included offenses of vehicular manslaughter.  Lodgment 3.  On April 30, 2013, the California Court of Appeals filed an opinion affirming the judgment of the trial court as modified.[2]  Lodgment 5.  Petitioner filed a petition for rehearing on May 21, 2013 which was denied on May 22, 2013.  Lodgments 6 and 7.  Petitioner filed a petition for review with the California Supreme Court on June 4, 2013 which was denied on July 10, 2013.  Lodgments 8 and 9.

On September 19, 2013, Petitioner filed a petition for writ of habeas corpus in the Superior Court of California, County of San Diego arguing that he was (1) convicted on an invalid information, (2) the recipient of ineffective assistance of counsel (3) a victim of prosecutorial misconduct, and (4) the victim of abuse of discretion when his motion to reduce the degree of his offense to manslaughter was denied.  Lodgment 10.  On December 5, 2013, the court denied three of Petitioner's claims and issued an order to show cause why the petition should not be granted as to Petitioner's ineffective assistance of counsel claim.  Lodgment 11.

On March 24, 2014, Petitioner filed a First Amended Petition for Writ of Habeas Corpus in the Superior Court of California, County of San Diego in which he alleged the same four claims as his previous petition.  Lodgment 14.  On May 29, 2014, the court found that the primary argument being raised in the Amended Petition was Petitioner's claim that his right to Due Process was violated when the People failed to file the information within fifteen days of his preliminary examination and denied the Amended Petition noting that Petitioner's claim was waived.  Lodgment 16.

---

[2] The appellate court reversed Petitioner's convictions on Counts 4 and 5 for driving under the influence and causing injury and driving with a .08 blood alcohol level or higher and causing injury.  Lodgment 5 at 8.

On May 20, 2014, Petitioner filed a petition for writ of habeas corpus in this Court. ECF No. 1. On June 14, 2014, Petitioner filed a Motion to Stay and Abey the federal proceedings while he exhausted his new claims in state court. ECF No. 11. The Court issued a Report and Recommendation for order denying Petitioner's motion to stay and motion to amend on February 27, 2015. ECF No. 38. On March 3, 2015, Petitioner filed a request to extend time to object to the Court's Report and Recommendation because he had an evidentiary hearing scheduled for March 20, 2015 in his habeas case that was still proceeding in state court. ECF No. 40. As part of the request, Petitioner provided the Court with an order from Judge Elias of the Superior Court for the County of San Diego setting the evidentiary hearing and summarizing the pending ineffective assistance of counsel claims. Id. at 5-6. This order was not provided to the Court by either party as part of the original lodgments and attachments to the original pleadings. See Docket; see also ECF No. 41. In light of the new information, the Court withdrew its February 2017 Report and Recommendation and filed an Amended Report and Recommendation on March 26, 2015. ECF No. 41. On August 5, 2015, District Judge Gonzalo P. Curiel issued an Order Adopting in Part the Court's Amended Report and Recommendation, Denying Petitioner's Motion for Stay and Abeyance Pursuant to Rhines, Granting Petitioner a Stay Pursuant to Kelly, and Denying Petitioner's Motion to Amend the Petition. ECF No. 45.

On January 27, 2015, Petitioner filed another petition for writ of habeas corpus in the Superior Court of California, County of San Diego alleging three counts of ineffective assistance of counsel and actual innocence. Lodgment 18. The court denied the petition on April 9, 2015 noting that a hearing was already scheduled with respect to the ineffective assistance of counsel claims and that the court had previously rejected some of the other arguments Petitioner was making. Lodgment 19. The court further noted that if Petitioner could not justify the filing of numerous habeas petitions, it could summarily deny Petitioner's claims, and that successive petitions are not permitted. Id.

On May 1, 2015, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Fourth Appellate District alleging (1) ineffective assistance of trial counsel, (2) ineffective assistance of appellate counsel, and (3) actual innocence. Lodgment 20. On June

18, 2015, the court denied Petitioner's petition due to procedural defects including a lack of sufficient evidentiary support to establish a prima facie claim for relief due to ineffective assistance of trial or appellate counsel. Lodgment 21.

On October 16, 2015, the Superior Court of California, County of San Diego issued an order denying Petitioner's writ of habeas corpus [see Lodgment 10]. Lodgment 36. Following the December 5, 2013 order to show cause, the court held an evidentiary hearing regarding Petitioner's claims of ineffective assistance of trial counsel. Id. The court found that the decision of Petitioner's counsel, Ms. Kathleen Cannon, to rely on the investigation performed by an investigator for the Public Defender's office with respect to Petitioner's claim of visiting an AM/PM before the accident did "not fall[] below the standards of a competent attorney." Id. at 4. The court also found that Ms. Cannon's failure to conduct an investigation regarding Petitioner's claim that he visited a McDonald's before the accident did "demonstrate a deficiency in performance by trial counsel," but that Petitioner did not establish prejudice that the trial would have been different but for Ms. Cannon's failure to investigate. Id.

On January 18, 2016, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Fourth Appellate District arguing that (1) he was entitled to a "recall of sentence," (2) his previous conviction was not a violent or serious felony pursuant to Penal Code § 667.5 or § 1192.7, and (3) in accordance with Proposition 47, Petitioner should be given a more appropriate sentence. Lodgment 22. The court summarily denied the petition on February 3, 2016. Lodgment 23.

On February 18, 2016, Petitioner filed a petition for writ of habeas corpus in the Supreme Court of California alleging the same three claims from his January 18, 2016 petition. Lodgment 24. The court summarily denied the petition on April 27, 2016. Lodgment 25.

On May 12, 2016, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Fourth Appellate District arguing that (1) he received ineffective assistance of trial counsel when his counsel failed to properly investigate his defense and when she failed to inform Petitioner of his right to testify at trial, (2) the judge erred when he improperly handled the information and complaint and continued the preliminary hearing by twenty-six days without

Petitioner's waiver or consent, (3) the District Attorney erred when he failed to file the information within fifteen days of the holding order issued at the preliminary hearing, and (4) he has made a colorable showing of actual innocence. Lodgment 26. On June 13, 2016, the court denied most of the claims with a quote from In re Clark (1993) 5 Cal. 4th 750, 767 that "[i]t has long been the rule that absent a change in the applicable law or the facts, the court will not consider repeated applications for habeas corpus presenting claims previously rejected" and found that Petitioner did "not demonstrate any prejudice under an objective standard of reasonable probability of an adverse effect on the outcome" with respect to his ineffective assistance of counsel claim. Lodgment 27.

On June 8, 2016, Petitioner filed a petition for writ of habeas corpus in the Superior Court of California, County of San Diego alleging that he was convicted under an unconstitutionally vague statue. Lodgment 28. On July 27, 2016, the court denied the petition noting that Petitioner failed to raise the issue on appeal or in his previous petitions and that he failed to make a prima facie showing of specific facts entitling him to habeas corpus relief under existing law. Lodgment 29.

On June 19, 2016, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court arguing that (1) he received ineffective assistance of trial counsel, (2) the judge erred when he improperly handled the information and complaint and continued the preliminary hearing by twenty-six days without Petitioner's waiver or consent, (3) the District Attorney erred when he failed to file the information within fifteen days of the holding order issued at the preliminary hearing, and (4) he has made a colorable showing of actual innocence. Lodgment 30. The California Supreme Court summarily denied the petition on August 10, 2016. Lodgment 31.

On September 13, 2016, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Fourth Appellate District arguing that he was convicted under an unconstitutionally vague statue. Lodgment 32. The court denied the petition on September 21, 2016. Lodgment 33.

Petitioner filed the instant FAP on October 14, 2017. FAP. Respondent filed an Answer

7

and Memorandum of Points and Authorities on January 29, 2018. ECF No. 71. Respondent also submitted Lodgments on January 29, 2018. ECF No. 72. On February 11, 2018, Petitioner filed a Traverse. ECF No. 76.

## SCOPE OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a) (West 2012).

The FAP was filed after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (West 2012). In making this determination, a court may consider a lower court's analysis. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (authorizing a reviewing court to look through to the last reasoned state court decision). Summary denials are presumed to constitute adjudications on the merits unless "there is reason to think some other explanation for the state court's decision is more likely." Harrington v. Richter, 562 U.S. 86, 98-101 (2011).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

8

Court and nevertheless arrives at a result different from [Supreme Court] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000).

A state court's decision is an "unreasonable application" of clearly established federal law where the state court "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003) (quoting <u>Williams</u>, 529 U.S. at 413). "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." <u>Id.</u> at 75-76 (citations and internal quotation marks omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412.

If the state court provided no explanation of its reasoning, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." <u>Harrington</u>, 562 U.S. at 102. In other words, a federal court may not grant habeas relief if any fairminded jurist could find the state court's ruling consistent with relevant Supreme Court precedent. <u>Id.</u>

Habeas relief also is available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2) (West 2012); <u>Wood v. Allen</u>, 558 U.S. 290, 293 (2010). A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court. <u>See</u> <u>Miller-El</u>, 537 U.S. at 340; <u>see also</u> <u>Rice v. Collins</u>, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that

presumption only by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1); <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473-474 (2007).

The exhaustion of available state judicial remedies is a prerequisite to a federal court's consideration of claims presented in habeas corpus proceedings. 28 U.S.C. § 2254(b)(1)(A); <u>see Rose v. Lundy</u>, 455 U.S. 509, 522 (1982); <u>McQueary v. Blodgett</u>, 924 F.2d 829, 833 (9th Cir. 1991).  Exhaustion of a habeas petitioner's federal claims requires that they have been "fairly presented" in each appropriate state court, including a state supreme court with powers of discretionary review.  <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004).  However, claims are not exhausted by mere presentation to the state appellate system.  A petitioner also must "alert[] [the state] court to the federal nature of the claim." <u>Id.</u> at 29.  A petitioner may indicate a federal claim by citing the source of federal law upon which he relies, or by merely labeling the claim as "federal."  <u>Id.</u> at 32.

## **DISCUSSION**

Petitioner presents six grounds for habeas relief.  FAP.  Petitioner claims that (1) there was insufficient evidence to support the implied malice element required for second degree murder in violation of his Fourteenth Amendment rights, (2) trial counsel provided ineffective assistance of counsel by failing to investigate the evidence that she presented to the jury in violation of his Sixth and Fourteenth Amendment rights, (3) his Sixth Amendment right to a speedy trial was violated, (4) the District Attorney failed to file the information within fifteen days in violation of Petitioner's Fourteenth Amendment rights, (5) his trial counsel provided ineffective assistance of counsel when she failed to inform Petitioner of his right to testify at his trial in violation of his Sixth and Fourteenth Amendment rights, and (6) the facts make a colorable showing of actual innocence.  <u>Id.</u> at 6-61.

Respondent argues that the state court's rejection of Petitioner's insufficiency of the evidence claim was reasonable and that claims two through six should be rejected as untimely. Answer at 10, 13.  Respondent alternatively argues that the state court's rejection of claims two through six was reasonable.  <u>Id.</u> at 7, 13-24.

///

## A. __Insufficient Evidence__

Petitioner alleges that there was insufficient evidence of implied malice as required for second degree murder in violation of his Fourteenth Amendment rights. FAP at 6.

Petitioner presented his first claim to the California Court of Appeal. Lodgment 3. The court of appeal affirmed the findings of the trial court in a reasoned opinion. Lodgment 5. The court stated:

> Romero argues there was insufficient evidence to support his second degree murder conviction. Specifically, he contends the record does not support a finding of implied malice because the facts show he waited six hours after his last drink before attempting to drive from Fullerton to San Diego. We reject this argument.

> When a defendant challenges the sufficiency of the evidence to support his conviction, we examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence from which the jury could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576, 578.) We must presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict," we will not reverse. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.) If the circumstances, plus all the logical inferences the jury might have drawn from them, reasonably justify the jury's findings, our opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1329.)

> "Murder is the unlawful killing of a human being ... with malice aforethought." (Pen.Code, § 187, subd. (a).) Malice is implied when the circumstances of the killing show "an abandoned and malignant heart." (Pen.Code, § 188.) Under *People v. Watson* (1981) 30 Cal.3d 290, 296–297, a homicide caused by a drunk driver may, under appropriate circumstances, be prosecuted as second degree murder. To support a second degree murder conviction based on implied malice, the defendant must have "deliberately performed an act, the natural consequences of which are dangerous to life, knowing that the conduct endangers the life of another, but acting with conscious disregard for that risk of life." (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.) To establish the requisite implied malice, a subjective standard is applied; in other words, the defendant must have actually appreciated the risk involved. (*Ibid.*) However, "'it is not necessary to establish that the defendant intended that his act would result in the death of a human being.' [Citation.]" (*People v. Swain* (1996) 12 Cal.4th 593, 603.) "The implied malice component of second degree murder may be described as a mental state encompassing these elements: knowledge that the act involves a high probability that death will result; a specific intent to do the act despite such knowledge; a

base, antisocial purpose with wanton disregard for human life." (*People v. Young* (1981) 120 Cal.App.3d 683, 692, italics omitted.)

Here, there was ample evidence that Romero harbored implied malice sufficient to support his second degree murder conviction. The evidence showed that Romero knew and appreciated the consequences and risks associated with driving while intoxicated. In the afternoon before the crash, Romero told Gold that someone would die if he drove that night. He made a similar comment to Shacreaw around 7:30 p.m. As late as 8:40 p.m., which was only two and a half hours before Romero alleges he started his drive from Fullerton to San Diego, Shacreaw told Romero that he was too drunk to drive.

Moreover, although Romero attempts to frame his argument to suggest that he made a conscious decision to wait until 11:15 p.m., six hours after his last drink, before driving, the evidence indicated that he was highly intoxicated, passed out or vomiting during most of that time. Further, Romero did not wait six hours before getting into a car. Despite his daughter's objections and statement that he was too drunk to drive, Romero pushed her aside and got into his vehicle around 8:40 p.m. when neighbors came to the house. Notably, Romero did not have to drive at that point. He had the option of allowing his daughter to move his car but refused her request for his car keys. According to Romero's son, Romero stopped at his house and drove again around 10:00 p.m. that night. Although Romero claims he did not drive until 11:15 p.m. and it is unclear what he did between 10:00 p.m. and the time of the crash, that does not change the result. In our view, the evidence does not indicate Romero made a purposeful decision to wait until he was sober because of the risks associated with drinking and driving. To the contrary, he was aware of the risks and made the decision to drive regardless of those risks.

We are also not convinced that evidence of the "Mellanby effect" diminishes Romero's culpability, especially where there was clear evidence that he knew the consequences of his actions and engaged in dangerous conduct. In addition to Romero's statements acknowledging the risks of drinking and driving and his decision to drive despite those risks, Romero's conduct showed a wanton disregard for life. Multiple witnesses observed Romero driving at a speed of approximately 100 miles per hour and recklessly changing lanes. These factors support a finding of implied malice. (*People v. McCarnes* (1986) 179 Cal.App.3d 525, 535 ["pattern of reckless, high-speed passing maneuvers" supported finding of implied malice]; *People v. Albright* (1985) 173 Cal.App.3d 883, 887 [defendant guilty of second degree murder where he drove at 100 miles per hour knowing that other people were on the road and must have known the high probability that he would cause death if he continued his conduct].)

Lastly, without developing the argument, Romero claims that "[w]ithout legally adequate evidence, [his] convictions also violate [his] federal constitutional right to due process." Having found that substantial evidence supported Romero's conviction for second degree murder, we reject his federal due process claim.

14cv1284-GPC(BLM)

Lodgment 5 at 4-7.

The clearly established federal law regarding sufficiency of the evidence claims in the criminal context is set forth in Jackson v. Virginia, 443 U.S. 307 (1979). Jackson claims face a high bar in federal habeas proceedings. Coleman v. Johnson, 566 U.S. 650, 651 (2012). In Jackson, the Court held that the Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324. In making this determination, habeas courts must respect "the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir.1995). "Circumstantial evidence alone can be sufficient to demonstrate a defendant's guilt." United States v. Cordova Baraias, 360 F.3d 1037, 1041 (9th Cir. 2004) (citing United States v. Reyes–Alvarado, 963 F.2d 1184, 1188 (9th Cir. 1992) ("[C]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction."). "Although it might have been possible to draw a different inference from the evidence, [a federal habeas court is] required to resolve that conflict in favor of the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1114–15 (9th Cir. 2011); see also Coleman, 566 U.S. at 651 (stating that "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'") (quoting Cavazos v. Smith, 565 U.S. 1, (2011)); see also Jackson, 443 U.S. at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution"). Federal habeas courts also must analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law." Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir.2004) (en banc) (quoting Jackson, 443 U.S. at 324 n. 16). When assessing the evidence presented at trial, a reviewing court must conduct a thorough

review of the state court record.  <u>Jones v. Wood</u>, 114 F.3d 1002, 1013 (9th Cir.1997).

The Ninth Circuit has made clear that "[a]n additional layer of deference is added to this standard by 28 U.S.C. § 2254(d), which obliges [Petitioner] to demonstrate that the state court's adjudication entailed an unreasonable application of the quoted *Jackson* standard."  <u>Briceno v. Scribner</u>, 555 F.3d 1069, 1078 (9th Cir. 2009) (citing <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005)).  In <u>Allen</u>, the Ninth Circuit first reviewed the standard of review applied by the state appellate court to a sufficiency of the evidence claim, and found that although the state court did not cite to the relevant federal case law, "such a citation is not required 'so long as neither the reasoning nor the result of the state-court decision contradicts' Supreme Court precedent." <u>Juan H.</u>, 408 F.3d at 1274 n. 12, quoting <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2003).  Accordingly, it falls to this Court to determine whether the state appellate court opinion here "reflected an unreasonable application of *Jackson* ... to the facts of this case." <u>Id.</u> at 1275.

As an initial matter, it is apparent from the appellate court's citation to <u>People v. Johnson</u>, 26 Cal.3d 557, 576, 578 (1980) that the state court applied the <u>Jackson</u> standard in reviewing Petitioner's sufficiency of the evidence claim.  The question, then, is whether it did so reasonably.  <u>See</u> <u>Briceno</u>, 555 F.3d at 1078; <u>Juan H.</u>, 408 F.3d at 1274.  Under California law, "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."  Cal. Penal Code § 187(a).  Second degree murder based on implied malice requires a defendant to have intentionally committed an act, the natural and probable consequences of which were dangerous to human life, while knowing at the time that the act was dangerous to human life, and acted deliberately with conscious disregard for human life.  California Jury Instructions, Criminal ("CALJIC") No. 8.31; <u>see</u> <u>also</u> Cal. Penal Code § 187(a).

Petitioner contests the sufficiency of the evidence to support the finding of implied malice.  FAP at 6.  Specifically, Petitioner contends that the trial court did not consider evidence establishing that he intentionally waited several hours after he had been drinking so that he could sober up before driving.  <u>Id.</u> at 6-23. Petitioner asserts that during this delay, he got food to eat at McDonald's and stopped for a cup of coffee at an AM/PM gas station.  <u>Id.</u> at 13-14.

Petitioner argues that the evidence showed that his blood alcohol level at the time of the accident was close to the legal limit so his mistake was delaying driving for seven hours, instead of eight or nine hours. Id. at 8-9. Petitioner argues that he miscalculated his level of sobriety in part due to the Mellanby effect, a scientific concept that recognizes individuals are less aware of the impact of alcohol in their system during the elimination phase as opposed to when they first begin drinking. Id. at 9.

Respondent contends that the state appellate court's rejection of the sufficiency of the evidence claim was reasonable. Answer at 13.

Petitioner's claim fails. As stated above, habeas courts must defer to the fact finder's credibility determinations, resolution of evidentiary conflicts, and reasonable inferences from proven facts. Walters, 45 F.3d at 1358. Here, there is ample evidence to support the jury's finding that Petitioner acted with implied malice. First, Petitioner's daughter, Victoria Shacreaw, testified that when her father first arrived at her home between 2:00 p.m. and 3:00 p.m., she gave him a double shot of tequila and a beer. Lodgment 35 at 350-351, 392. She also testified that when she left to take her friend to Riverside between 5:00 p.m. and 5:30 p.m., she told her mother not to let Petitioner drive because he was already buzzed, drinking a beer, and talking about driving to San Diego. Id. at 357-358, 392. Ms. Shacreaw further testified that when she returned around 7:00 p.m., Petitioner was asleep with vomit on his arm until about 9:00 p.m. Id. at 358 -360, 393-394. Also, at one point Petitioner got up to leave and Ms. Shacreaw told him that he could not go because he looked as though he was not feeling well and was very tired. Id. at 361. Ms. Shacreaw further testified that when her neighbors asked her to move her father's car out of their driveway at around 8:45 p.m., she asked Petitioner for his keys, but he said no, got up and ran to his car. Id. at 365, 396, 398. At that time, Ms. Shacreaw "believe[d] that [Petitioner] was still somewhat intoxicated," but not drunk. Id. at 374. At the time, Ms. Shacreaw thought that it would be good for her father to drive his car into a wall near her residence because it would mean that he would not hurt anyone else. Id. at 375. She further testified that she was scared for her father when he left and that at around 7:15 p.m./7:30 p.m., her father told her that he would die if he drove that evening. Id. at 376-

379, 399.  Ms. Shacreaw also testified that in the past she had conversations with her father about the dangers of drinking and driving and her father had previously expressed, on multiple occasions, how dangerous it was to consume alcohol and then drive.  <u>Id.</u> at 381.

Ms. Shacreaw also testified that many of the statements she previously had made to Mr. Daniel Simas, an investigator for the San Diego District Attorney's Office, were inaccurate because she felt rushed during the interview and distracted by the presence of her two year old child.  Lodgment 35 at 351-352.  Those statements, which were presented to the jury, included telling Mr. Simas that (1) on the night of the accident she gave her father another shot of tequila after having already served him a double shot of tequila and a beer, (2) when she returned from Riverside, Petitioner was "plastered," (3) when her father got up to leave she did not want him to drive because he was too drunk, (4) when Petitioner tried to leave she tried to stop him because he looked as though he was still heavily intoxicated, (5) Petitioner pushed her and her elderly neighbors out of the way when he got up to move his car, (6) she thought Petitioner was drunk and angry when he left her house, and (7) Petitioner told her that if he drove, he would die or someone else would die.  <u>Id.</u> at 346-414.

Mr. Simas testified that he interviewed Ms. Shacreaw on January 27, 2011 and recorded their conversation.  <u>Id.</u> at 944.-945.  Mr. Simas testified that she did not appear to be rushed or hurried when responding to questions, did not appear to be confused or to have trouble understanding the questions, and  was given the opportunity to change, modify, or expand her answers to questions during the interview and did in fact do so.  <u>Id.</u>  Mr. Simas did not testify at length about the content of the interview, but instead played audio clips of the interview for the jury.  <u>Id.</u> at 943-957.

Second, Petitioner's ex-wife, Ms. Christina Romero Gold, testified that when Petitioner arrived at her home the night of the accident, he appeared to have already had a few alcoholic beverages.  <u>Id.</u> at 418.  She also testified that Ms. Shacreaw gave Petitioner tequila after he arrived and that Petitioner was not acting like himself because he was being loud, singing, and "pawing" at her even though they were divorced.  <u>Id.</u> at 421-422, 438, 443.  Ms. Gold testified that she was concerned about Petitioner leaving the house because he was too drunk to drive

so she asked him to "crash on the couch" where he passed out until he began vomiting on her floor. Id. at 422, 435. Additionally, she testified that after she left the residence, Ms. Shacreaw called her several times because she was very upset that Petitioner was trying to leave and she was concerned that something bad would happen. Id. at 425. Ms. Shacreaw also told Ms. Gold that Petitioner pushed her as he was attempting to leave. Id. at 425-426. Finally, Ms. Gold testified that she could not recall if the statement that if Petitioner drove that night, somebody would die was made directly to her by Petitioner or made to Ms. Shacreaw. Id. at 426-435, 488.

Knowledge of the hazards of drinking and driving while intoxicated is a factor considered by California courts when upholding drunk driving murder convictions. See Torres, 2007 WL 3034269, at *7 (citing Talamantes (1992) 11 Cal.App.4th at 973). The testimony of Ms. Shacreaw and Ms. Gold provides evidence that Petitioner was too drunk to drive safely, that he was warned that he should not drive that evening because he was too drunk, that he was aware of the dangers of drinking and driving, and that he believed he had drank too much to be able to drive safely. As such, there was ample evidence supporting the jury's verdict and the appellate court's decision was reasonable. Id. (denying habeas challenge to second degree murder for death caused by drunk driving where petitioner was aware of the hazards of drinking and driving after being arrested five times for driving under the influence even though he was never convicted for any of the arrests).

Third, Mr. Jorge Pena, a criminalist with the San Diego County Sherriff's Crime Laboratory testified that Petitioner's blood alcohol level was .10% at around 2:00 a.m., approximately two hours after the accident occurred and that based on a normal rate of elimination, Petitioner's blood alcohol level at the time of the crash was between .125 and .145 percent. Lodgment 35 at 831-834. Another factor California courts have considered when upholding drunk driving murder convictions is a blood alcohol level above .08%. See Torres v. Lamarque, 2007 WL 3034269, at *7 (E.D. Cal. Oct. 16, 2007) (citing People v. Talamantes (1992) 11 Cal.App.4th 968, 973). This testimony also supports the jury's finding and the reasonableness of the appellate court's decision as it establishes that Petitioner was legally drunk with a blood alcohol level over .08 at the time of the accident. See Torres, 2007 WL 3034269, at *7 (finding that

the state court's determination that petitioner was liable for second degree murder for death caused by drunk driving was not unreasonable where among other factors, petitioner had a blood alcohol level of .17 percent at the time of his accident).

Finally, several witnesses testified about the extremely dangerous nature of Petitioner's driving on the night of the accident. Mr. Robert Houston, III testified that he was driving down the highway on the night of the accident at around 70 mph when he saw Petitioner's car coming from behind at a very high rate of speed, approximately 100 mph. Id. at 454. Mr. Houston testified that after Petitioner's car passed him, he saw Petitioner swerving and weaving in and out of traffic. Id. Mr. Houston described Petitioner's driving as reckless. Id. at 455. Mr. Casper Liu testified that he was driving on the highway on the night of the accident and Petitioner's vehicle caught his attention because the high beams were on and the car was traveling at a high rate of speed, 90-95 mph. Id. at 479. Mr. Liu testified that he saw Petitioner's car hit a Ford Explorer causing the Explorer to spin out of control and two bodies to be ejected. Id. at 481-483. Mr. Justin Chang testified that he witnessed Petitioner's accident and that prior to the accident Petitioner was traveling approximately 100 miles per hour with his high beams on. Id. at 509-510. Mr. Raymond Vuong testified that he was driving on the highway the night of the accident at about 75 mph when Petitioner passed him driving around 100 mph and hit the Ford Explorer. Id. at 528-531. Mr. Andrew Penniman also testified that he saw Petitioner's car on the night of the accident going about 85-90 mph and switching lanes in a dangerous manner before his accident with the Explorer. Id. at 539-551. Finally, Mr. Michael Murphy testified that he saw Petitioner on the night of the accident driving around 90-95 mph and crossing four lanes of traffic in a reckless manner. Id. at 552-559. See Dungan v. Barnes, 2011 WL 5877064, at *8 (E.D. Cal. Nov. 22, 2011) (denying petitioner's request for habeas relief for second degree murder conviction where petitioner's blood alcohol level was more than twice the legal limit at the time of the accident and petitioner engaged in highly dangerous driving by speeding, texting and using his peripheral vision while driving); see also Farley v. Madden, 2018 WL 1069444, at *8 (C.D. Cal. Jan. 17, 2018) (denying petitioner's request for habeas relief for second degree murder conviction where petitioner had a blood-alcohol level of 0.22 to 0.23 percent and had

14cv1284-GPC(BLM)

Klonopin in his system and where even though "there was no evidence that [Petitioner] had engaged in reckless or highly dangerous driving before the collision, the evidence supported a finding that he caused the collision by making the highly dangerous maneuver of making a left turn against a red light and accelerating into an intersection.").

Viewing the evidence in the light most favorable to the prosecution, there is overwhelming evidence supporting the jury's verdict of second degree murder based on implied malice. A rational fact finder easily could have concluded that Petitioner (1) intentionally drove his car while drunk knowing that the natural and probable consequences of that action was dangerous to human life and with a conscious disregard for human life and (2) intentionally drove his car at a high rate of speed, recklessly changing lanes, and with a wanton disregard for human life. Given that the trial court's decision is well-supported by the factual record and is a reasonable interpretation of the facts as they were presented in the state court proceeding and that the state court's analysis and decision denying the sufficiency of evidence claim was not "contrary to or an unreasonable application of Federal law," the Court **RECOMMENDS** that Petitioner's Petition be **DENIED** on this ground.

**B.   Timeliness**

Respondent contends that Petitioner's remaining claims are untimely as they do not relate back to the sufficiency-of-the-evidence claim that was timely filed in Petitioner's initial petition. Answer at 10.  Respondent explains:

> The sufficiency of the evidence claim challenges the weight of the evidence presented at trial. In comparison, Romero's claims in grounds two through six arise from Romero's challenge of distinct actions taken by different actors at different points in time, notably, trial counsel's conduct prior to and during trial, and the State's actions prior to trial, as related to the alleged speedy trial violation and alleged delay of the filing of the information.

Id. at 11.  Petitioner replies that "Respondent's An[s]wer is untrue."  Traverse at 2.

Given the lengthy and convoluted procedural history of this litigation, the Court finds that judicial economy and efficiency dictate that the Court resolve the remaining claims on the merits, rather than on procedural issues such as timeliness or procedural bars.  See Arias v. Frauenheim,

2017 WL 7000270, at *6 (C.D. Cal. Nov. 13, 2017) ("Because respondent has addressed all of the claims on the merits and it is clear that the claims are not colorable, it is in the interest of judicial efficiency for this court to consider the potentially untimely claims on their merits") (citing Lambrix v. Singletary, 520 U.S. 518, 525, 117 S. Ct. 1517 (1997) (court may address merits without reaching procedural issues where interests of judicial economy are served by doing so); and Cassett v. Stewart, 406 F.3d 614, 623–24 (9th Cir. 2005) (court may deny unexhausted claim on the merits if it is "perfectly clear" that the claim is without merit)); see also Keller v. Baca, 2018 WL 894614, at *3 (D. Nev. Feb. 13, 2018) (declining to decide the issue of equitable tolling in the interest of judicial economy where equitable tolling claim was non-frivolous and would require further factual development)[3].

## C.   Ineffective Assistance of Trial Counsel – Failure to Investigate

In his second claim, Petitioner alleges that his Sixth and Fourteenth Amendment rights were violated when his counsel failed to investigate evidence before presenting it to the jury during the penalty phase of Petitioner's trial. FAP at 24. Petitioner explains that he bought and ate food at a McDonald's restaurant and bought and drank coffee at an AM/PM mini-mart (and spoke with the cashier) after he left the Gold home and before the accident. Id. at 24-29. Petitioner argues that this evidence, if properly investigated and presented, would have negated the implied malice element of the second degree murder charge. Id. Petitioner acknowledges that his lawyer mentioned the McDonald's purchase but argues that she failed to properly investigate both stops and failed to present persuasive evidence, such as the cashier's testimony, store video, or receipts, establishing his conduct before the accident. Id. Respondent contends

---

[3] (citing Van Buskirk v. Baldwin, 265 F.3d 1080, 1083 (9th Cir. 2001) (Court may properly deny petition on merits rather than reaching "the complex questions lurking in the time bar of the AEDPA."), cert. denied, 535 U.S. 950 (2002); Cooper v. Calderon, 274 F.3d 1270, 1275 n. 3 (9th Cir. 2001) (per curiam) (denying petition on merits rather than remanding to consider equitable tolling); and Day v. McDonough, 547 U.S. 198, 208–209 (2006) ("In lieu of an inflexible rule requiring dismissal whenever AEDPA's one-year clock has run ... the State reads the statutes, Rules, and decisions in point to permit the exercise of discretion ... to decide whether the administration of justice is better served by dismissing the case on statute of limitations grounds or by reaching the merits of the petition .... We agree.").

that the state court's rejection of Petitioner's assertion of <u>Strickland</u> error was reasonable. Answer at 16.

Petitioner presented his claim to the Superior Court of California, County of San Diego in his first habeas petition. Lodgment 10. The superior court issued an order to show cause why the petition should not be granted as to Petitioner's ineffective assistance of counsel claim. Lodgment 11. Petitioner presented his ineffective assistance of counsel claim to the Superior Court of California, County of San Diego again in his request to file a first amended petition for writ of habeas corpus. Lodgment 14. After holding an evidentiary hearing on the order to show cause, in its October 16, 2015 order denying Petitioner's Petition for Writ of Habeas Corpus, the Superior Court of California, County of San Diego concluded:

> As it relates to the investigation involving the AM-PM, the Court finds that Ms. Cannon's reliance on the investigation by Mr. Mosemak, a skilled investigator, is appropriate and not falling below the standards of a competent attorney. Mr. Mosemak provided sufficient detailed information for him, and therefore Ms. Cannon, to rely on the employee of AM-PM in their review of the surveillance footage. The Court finds that it was not necessary to view the surveillance footage themselves. Such conduct does not fall below an objective standard of reasonableness as enunciated in *Strickland* (supra).
>
> As it relates to the lack of any investigation into McDonald's the Court finds that failure to investigate particular McDonald's that were nearby the Petitioner's residence does demonstrate a deficiency in performance by trial counsel. The evidentiary photograph showing a McDonald's bag in the rear seat footwell of the Petitioner's car put counsel on notice. In fact, trial counsel argued the significance of the bag during the trial. In the instant case, trial counsel made a tactical decision that relying solely on the photographic evidence of the bag gave her the ability to argue the reasonable inference therefrom. Whereas further investigation of McDonald's ***may*** have produced a witness who came into contact with the Petitioner shortly before the accident who ***may*** have been able to testify as to the Petitioner's apparent state of sobriety (emphasis added).
>
> However, Petitioner must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Elmore v. Sinclair* (9th Circuit 2015) 799 p.3rd 1238, 1249. Based on the testimony provided at the hearing, Petitioner has failed to sustain his burden of proving that Ms. Cannon's actions, to the extent she may have failed to investigate that the results of the trial would have been different.
>
> A fair assessment of attorney performance requires that every effort be made to

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy." (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) *In re Jones* (1996) 13 Cal.4th 552,561.

In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."]; *see also In re Marquez* (1992) 1 Cal.4th 584, 602. "[B]efore counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation."]; *In re Fields* (1990) 51 Cal.3d 1063, 1069; *People v. Ledesma, supra,* 43 Cal.3d at p. 215; *In re Hall* (1981) 30 Cal.3d 408, 426 "[W]hile acknowledging the wide latitude and discretion necessarily vested in trial counsel in the area of tactics and strategy, we stress that the exercise of that discretion must be a reasonable and informed one in the light of the facts and options reasonably apparent to counsel at the time of trial, and founded upon reasonable investigation and preparation."]; *People v. Frierson* (1979) 25 Cal.3d 142, 166; *In re Jones* (1996) 13 Cal.4th 552, 565.

In the instant case, there was ample evidence that the Petitioner harbored implied malice sufficient to support his conviction for second degree murder and that the Petitioner knew and appreciated the consequences and risks associated with driving while intoxicated. The Petitioner stated, on the day and evening in question, that he was too drunk to drive and that if he did drive, that someone would die that night. Further the evidence showed that Petitioner conduct showed a wanton disregard for life which was demonstrated by his driving at speeds of approximately 100 miles per hour and recklessly changing lanes. These factors clearly support a finding of implied malice. See *People v. McCarnes* (1986) 179 Cal.App.3rd 525 and *People v. Albright* (1985) 173 Cal.App.3rd 883.

Based upon the above, the Petitioner did not create a substantial, not just conceivable, likelihood of a different result or that any real possibility of being acquitted was eclipsed by trial counsel's failure to investigate. *Andrews v. Davis* (9th Circuit 2015) 798 p.3rd 759, 778.

For the foregoing reasons, the Petitioner's Writ of Habeas Corpus is hereby **DENIED**.

Lodgment 36 at 4-7.

Petitioner raised the claim again in a petition for writ of habeas corpus in the California

Court of Appeal, Fourth Appellate District and in a petition before the California Supreme Court. Lodgments 26 and 30. The claim was summarily denied by the California Supreme Court [see Lodgment 31] so this Court must "look through" to the California Court of Appeal's decision, which rejected Petitioner's claim. Ylst, 501 U.S. at 801–806. The court of appeal stated:

> Romero also claims that his counsel was ineffective for failing to fully investigate his defense that he lacked the requisite state of mind to be convicted of second degree murder. As discussed on direct appeal, Romero was convicted of second degree murder based on the jury's finding that he acted with implied malice when he drove his car recklessly on the freeway after drinking heavily at a party earlier in the day. The evidence at trial suggested he left the party around 10 p.m. and crashed into another car at a high speed shortly before midnight, killing its driver. As directly discussed on appeal, the fact that it was unclear what Romero was doing between 10:00 p.m. and the time of the crash is irrelevant to the issue of Romero's state of mind given his actions and statements earlier in the day.
>
> Romero now claims that during that timeframe, he was driving around with a friend, ordering fast food, and getting coffee at a gas station. He asserts he told his trial counsel these facts and she failed to properly collect the evidence necessary to present such evidence at trial. He seems to suggest that the fact he was eating food demonstrates that he believed he was sober and, therefore, did not appreciate that he was drunk and that driving in his condition involved a high probability of death.
>
> Even accepting the truth of Romero's claims and assuming his counsel's investigation was inadequate, Romero does not demonstrate any prejudice under an objective standard of reasonable probability of an adverse effect on the outcome. (*People v. Waidla* (2000) 22 Cal.4th 690, 718.) The evidence at trial demonstrated that Romero understood both that he was too drunk to drive and the risks of driving under the influence of alcohol, yet decided to drive regardless of those risks. Based on the totality of the circumstances, including Romero's blood-alcohol content at the time of the crash and his earlier statements to his family that if he drove, someone would die, it is immaterial how Romero precisely spent his time immediately before he decided to drive recklessly and, as a result, kill another person. Even if the jury was told that Romero was buying food and coffee in the hours before the crash, there is no reasonable probability the jury would have reached a different result.

Lodgment 27 at 2.

Under clearly established federal law, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland

14cv1284-GPC(BLM)

v. Washington, 466 U.S. 668, 686 (1984).   To prove ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense.  Id. at 687.  The proper measure of attorney performance is "simply reasonableness under prevailing professional norms."  Id. at 688.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;" that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  Id. at 689-690. To determine whether errors of counsel prejudiced the defense, a court "must consider the totality of the evidence before the judge or jury" and consider whether "the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."  Id. at 696.   The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one.  Id. at 697.

The Supreme Court has held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Wiggins v. Smith, 539 U.S. 510, 520 (2003).  Choosing to forego a particular investigation must be a "reasoned choice."  Id. at 510, 518.  While a lawyer's failure to investigate crucial witnesses may indicate an inadequate investigation, "counsel need not interview every possible witness to have performed proficiently."  Riley v. Payne, 352 F.3d 1313, 1318 (9th Cir. 2003) (citing LaGrand v. Stewart, 133 F.3d 1253, 1274 (9th Cir. 1998) (concluding there was no prejudice where trial counsel had personally interviewed the one eyewitness and read investigative reports and transcripts of interviews with all other witnesses)); see also Huffington v. Nuth, 140 F.3d 572, 580 (4th Cir. 1998) (noting that "the failure to investigate everyone whose name happens to be mentioned by the defendant does not suggest ineffective assistance.").  "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable ...."  Strickland, 466 U.S. at 690.

Petitioner argues that he informed his counsel of the events leading up to the accident, including the fact that after drinking he did not immediately drive and, instead, got a ride home from one of his customers, Dave.  FAP at 26.  Once at home, Petitioner picked up a few items

24

and then Dave drove him to McDonald's where Petitioner ordered food that he ate while sitting in the parking lot.  Id.  Petitioner then drove to an AM/PM where he had a cup of coffee and chatted with the cashier.  Id.  Petitioner notes that there was trash in his car at the accident scene from both McDonald's and AM/PM in support of his story.  Id. at 28.  Petitioner argues that if his counsel had contacted Dave or gone to the McDonald's and AM/PM, she could have reviewed video footage showing that Petitioner was not driving at that time and possibly found a witness, all of which could have shown that Petitioner lacked the implied malice necessary for his second degree murder conviction.  Id. at 24-38.

Here, the state court heard testimony, received evidence, and determined that trial counsel was ineffective in her failure to investigate Petitioner's conduct at the McDonald's, but not ineffective in her investigation related to the AM/PM mini market.  Lodgment 36.  For purposes of this review, the Court accepts the state court's determination and finds its conclusion was reasonable with regard to the inadequacy of the McDonald's investigation and the conclusion that counsel was ineffective.  With regard to the AM/PM investigation, the state court found that Ms. Cannon's reliance on the investigation performed by a skilled investigator was appropriate and did not fall below the standards of a competent attorney.  Id.  The investigator provided Ms. Cannon with sufficient information to justify her reliance on the AM/PM employee's review of the surveillance footage.[4]  Id.  The Court finds that the state court's decision was not an unreasonable application of Strickland and other clearly established Federal law and, therefore, Petitioner has not established that counsel's conduct with regard to the investigation of Petitioner's contacts with the AM/PM mini market was deficient.

With regard to the second prong of the Strickland inquiry, the state court determined that

---

[4] The investigator, Mr. Robert Mosemak, worked for the Public Defender's office and at Ms. Cannon's request, he contacted the AM/PM location by telephone, inquired about their surveillance videos, spoke with the field manager about the video surveillance and provided the manager with a detailed description of Petitioner's car, Petitioner himself, and the date and time at issue, and faxed a color photograph of Petitioner.  Lodgment 36.  The field manager informed Mr. Mosemak that after reviewing the video, "neither the car nor the person was seen on it."  Id.  Based on that information and his opinion that the employee was credible, Mr. Mosemak did not find it necessary to go to the AM/PM and view the video himself.  Id.

Petitioner had not established the requisite prejudice given the "ample" evidence establishing Petitioner's knowledge of the dangers of drinking and driving and Petitioner's reckless and dangerous driving immediately before the accident. Id. This Court agrees. "Ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." Johnson v. Baldwin, 114 F.3d 835, 838 (9th Cir. 1997) (quoting Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986)). As discussed above, there is overwhelming evidence supporting the jury's finding of implied malice. For example, Petitioner's ex-wife testified that Petitioner appeared to have already been drinking when he arrived at her home that afternoon and that he continued to drink throughout the evening. Lodgment 35 at 418-422. She further testified that she was concerned that he was too drunk to drive and that after she left, her daughter called upset about the fact that Petitioner was trying to leave the home and drive his car. Id. at 425, 435. Petitioner's daughter testified that when her father arrived at her mother's home she gave him a double shot of tequila and a beer and advised her mother not to let Petitioner leave the house because he was already "buzzed" and talking about driving to San Diego. Id. at 351, 357-358. She also testified that (1) at some point during the evening Petitioner vomited, (2) when Petitioner left the house she believed that he was "still somewhat intoxicated," (3) she hoped that he would crash into the wall near her home so that he did not hurt anyone else, and (4) at around 7:15 p.m. or 7:30 p.m., Petitioner told her that he would die if he drove that evening. Id. at 374-379, 399. Finally, she testified that she and Petitioner had previously had multiple conversations about the dangers of drinking and driving. Id. at 381. Multiple witnesses also testified as to the reckless manner in which Petitioner was driving before the accident occurred, including driving with his high beams on at an excessive rate of speed estimated to be between 85 and 100 miles per hour while swerving and weaving in and out of traffic. In addition, it was reported that Petitioner's blood alcohol level was .10% at around 2:00 a.m., approximately two hours after the accident occurred.[5] Id. at 831.

---

[5] Mr. Jorge Pena, "a criminalist with the San Diego County Sherriff's Crime Laboratory testified that based on a normal rate of elimination, [Petitioner's] blood alcohol level at the time of the crash was between .125 and .145 percent." Lodgment 5 at 4; see also Lodgment 35 at 833-

14cv1284-GPC(BLM)

Petitioner argues at length that he was prejudiced by counsel's failure to present evidence regarding his visits to McDonald's and the AM/PM mini market and that his customer, not Petitioner, was driving when he left Ms. Gold's home to go to his own home and to McDonald's.[6] FAP at 25-26, 32. Petitioner asserts that this evidence would have shown the jury that he made significant efforts to sober up before he drove and, in fact, looked and acted sober. Id. at 29, 32-38. Even if Petitioner is correct that there was omitted evidence that would have shown that Petitioner ate food, drank coffee, and had another person drive his car after leaving Ms. Gold's house and before the accident, there still was overwhelming evidence showing that Petitioner was aware of the dangers of drinking and driving, drank an excessive amount of alcohol earlier in the day, was driving[7] the car in an exceedingly reckless manner at speeds of 85-100 miles

---

834.

[6] Petitioner argues that his customer Dave Bockman was driving his car when he left his ex-wife's home which demonstrates that he did not have the implied malice required for second degree murder because he waited after consuming alcohol before driving his car. FAP at 26, Exh. 5. Petitioner alleges that he informed his counsel about Mr. Bockman in his first interview with her and in the October 17, 2010 letter that he wrote to his counsel [see id. at Exh. 4] which she admitted to having read at the Evidentiary Hearing on the Order to Show Cause. Id. at 37. Petitioner argues that had his counsel investigated this issue, Mr. Bockman could have testified that he was driving the car when Petitioner left Ms. Gold's home. Id. Mr. Bockman passed away around April 2013 of a heart attack. Id. at 32, Exhibit 6. It is unclear if Petitioner presented the exact argument regarding Mr. Bockman in his previous petitions. Petitioner does raise ineffective assistance of counsel for failing to investigate, but when he refers to the potential witnesses his counsel could have found, Petitioner focuses on witnesses such as the cashier from AM/PM who could have testified that Petitioner did not seem drunk just fifteen minutes before the accident and whom Petitioner described as having "the most crucial evidence" or other witnesses at the AM/PM or McDonald's who may have seen Petitioner in the passenger seat at the drive through window or eating in the parking lot. Lodgments 10 and 14.

[7] Mr. Erin Forry, the Quality Manager for the Boston Police Department Crime Laboratory and former Criminalist in the Forensic Biology section of the San Diego County Sheriff's Crime Laboratory testified that she performed a forensic analysis in Petitioner's case and found that DNA samples taken from the driver's side airbag and metal guardrail near the accident contained blood stains that matched DNA samples taken from Petitioner. Lodgment 35 at 593-600. As such, there was ample evidence supporting the jury's determination that Petitioner was driving.

per hour in the minutes before the accident, and had a blood alcohol level exceeding .10% at the time he crashed into the victims' car. As such, Petitioner's prejudice argument lacks factual support and merit.

Given all of the evidence of implied malice on the part of Petitioner that was presented to the jury, there is no reasonable likelihood that the outcome would have been different had Petitioner's counsel conducted further investigation and presented additional evidence regarding his trips to McDonald's and AM/PM and whether Petitioner or someone else was driving after the party and before the accident. Accordingly, the state court's decision is not "contrary to" nor an "unreasonable application of" clearly established federal law or based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d) and this Court **RECOMMENDS** that Petitioner's Petition be **DENIED** on this ground.

**D.    Ineffective Assistance of Counsel - Failure to Allow Petitioner to Testify**

In his fifth claim, Petitioner alleges that his Sixth and Fourteenth Amendment rights were violated when his counsel failed to permit him to testify. FAP at 44. Respondent contends that Petitioner's claim is meritless. Answer at 21.

Petitioner raised this claim in a habeas petition in the Superior Court of California, County of San Diego. Lodgment and 18. Petitioner raised the claim again in two different petitions for writ of habeas corpus in the California Court of Appeal, Fourth Appellate District. Lodgments 20 and 26[8]. Petitioner raised the claim again in a petition before the California Supreme Court. Lodgment 30. The claim was summarily denied by the California Supreme Court [see Lodgment

---

[8] In denying this petition, the court stated "In his current writ petition, Romero presents five distinct grounds for relief, all except one he concedes are substantively identical to claims raised in his previous petition for writ of habeas corpus. "It has long been the rule that absent a change in the applicable law or the facts, the court will not consider repeated applications for habeas corpus presenting claims previously rejected." (*In re Clark* (1993) 5 Cal.4th 750, 767.) Here, Romero presents no change in law or facts warranting reconsideration of his claims." Lodgment 27.

31] so this Court must "look through" to the California Court of Appeal's decision, which rejected Petitioner's claim.  Ylst, 501 U.S. at 801–806.  The court of appeal concluded:

> William Vincent Romero's petition for writ of habeas corpus has been read and considered by Justices Haller, O'Rourke and Irion.  It arises out of Romero's 2011 conviction of second degree murder, gross vehicular manslaughter and hit and run with death or permanent serious injury, with true findings that he fled the scene, for which he was sentenced to prison for 16 years to life.[9] The petition argues that Romero suffered ineffective assistance at trial and on appeal. Specifically, Romero contends his trial counsel (1) failed to challenge (a) the prosecution's dismissal of the original felony complaint against him after the magistrate refused to allow its amendment shortly before trial to add murder and manslaughter charges and (b) the magistrate's continuances of the preliminary hearing (including one 26-day continuance) without obtaining his waiver or making a finding of good cause; (2) failed to advise him of his right to testify at trial; and (3) prevented him from testifying in his own defense despite his desire to do so. He also contends that he suffered ineffective assistance on appeal as a result of appointed counsel's failures to raise these issues and to augment the record with the dismissed complaint. Finally, Romero asserts that his evidence is sufficient to establish a "colorable showing" of his actual innocence of the charges for which he was convicted and that his late filing of this petition should be excused on that basis.
>
> Romero's petition suffers from fatal procedural defects. First, he has not shown that he has sought relief from the superior court in the first instance on these claims.[10]  Second, the petition does not provide sufficient evidentiary support to establish facts supporting a prima facie claim for relief based on the ineffectiveness of either his trial or appellate counsel. (*In re Clark* (1993) 5 Cal.4th 750, 770.) For example, although Romero claims his trial counsel should have challenged the prosecutor's dismissal of the first felony complaint against him, he has not shown (1) why his trial counsel failed to make such a challenge, (2) that there could be no satisfactory explanation for counsel's failure to object, or (3) that he would have obtained a more favorable result absent her conduct. Accordingly, Romero has not met his burden to establish a prima facie case of ineffective assistance. (See *In re Hall* (1981) 30 Cal.3d 408, 426.) Romero's remaining objections about the effectiveness of his trial and appellate counsels' performances is similarly lacking in evidentiary support.

---

[9] We take judicial notice of Romero's direct appeal from the judgment of conviction, which this court affirmed. (*People v. Romero* (Apr. 30, 2013, D060887) [nonpub. opn.].).

[10] It appears, however, that Romero does have a hearing pending in the superior court on a habeas petition asserting ineffective assistance claims regarding trial counsel's failure to conduct an adequate investigation.

The petition is denied.

Lodgment 21 at 1-2.

An accused's right to testify in his own defense is "well established" and is a "constitutional right of fundamental dimension." Shelton v. Kernan, 2017 WL 2691918, at *5 (E.D. Cal. June 22, 2017) (quoting United States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993)) (citing Rock v. Arkansas, 483 U.S. 44, 51 (1987)). The right may only be waived by the defendant and such waiver must be knowing and intentional. Id. (citing Joelson, 7 F.3d at 177). However, the waiver may be explicit or implicit. Torres v. Myrick, 2015 WL 5813340, at *4 (D. Or. Oct. 2, 2015). Waiver may be inferred from a defendant's failure to testify at trial or to notify the court of his desire to testify. Id. A defendant is "presumed to assent to his attorney's tactical decision not to testify, but he can reject his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer." Id. (quoting Joelson, 7 F.3d at 174, 177). Thus, "[w]hen a defendant remains 'silent in the face of his attorney's decision not to call him as a witness,' he waives the right to testify." Ramirez v. Yates, 2012 WL 2050430, at *24 (E.D. Cal. June 6, 2012) (quoting United States v. Pino–Noreiga, 189 F.3d 1089, 1095 (9th Cir. 1999)).[11] "A reasonable tactical decision by counsel with which the defendant disagrees cannot form a basis for an ineffective assistance of counsel claim" and a court "does

---

[11] Citing Dows v. Wood, 211 F.3d 480, 487 (9th Cir. 2000) ("Dows argues that Egger denied him his right to testify at trial by threatening to walk out on Dows in the middle of trial if he insisted on testifying. Again, this argument is without factual support. In its order denying Dows a new trial, Judge Martinez noted that at no time during the trial did Dows ever indicate that he wanted to testify or that he was prevented from doing so by counsel."); Gutierrez v. Subia, 2008 WL 1968357, at *15–16 (C.D. Cal. Apr. 30, 2008) (finding no ineffective assistance of counsel and that petitioner waived claim because there was no indication in the record that he contemporaneously made known any desire to testify during trial); McElvain v. Lewis, 283 F.Supp.3d 1104, 1118 (C.D. Cal. 2003) (finding that where petitioner remained silent when trial counsel rested without calling him as a witness, that petitioner waived right to testify and cannot claim ineffective assistance of counsel due to trial counsel's failure to call him as a witness); and Dewberry v. Cambra, 1998 WL 908923, at * 11 (N.D. Cal. Dec. 22, 1998) (denying petitioner's claim that counsel was ineffective in advising him not to testify because petitioner did not object at trial).

not consider whether another lawyer with the benefit of hindsight would have acted differently than Petitioner's trial counsel," but only looks to "whether Petitioner's trial counsel made errors so serious that counsel failed to function as guaranteed by the Sixth Amendment." Palacios v. Uribe, 2011 WL 759870, at *4 (C.D. Cal. Jan. 19, 2011) (citing Strickland, 466 U.S. at 687-689). "A tactical decision exercised by counsel deserves deference when counsel makes an informed decision based on strategic trial considerations and the decision appears reasonable under the circumstances." Phillips v. Martel, 2012 WL 3288085, at *19 (E.D. Cal. Aug. 10, 2012) (finding that petitioner failed to show "that counsel's recommendation for Petitioner to testify on his behalf was ineffective assistance of counsel" and noting that petitioner did not describe how the decision was injurious to his defense or show that it was not a reasonable tactical choice) (citing Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994)). "[A]bsent exceptional circumstances, a defendant is bound by the tactical decisions of competent counsel." Rossignolv. Blades, 2014 WL 1319827, at *3 (D. Idaho Mar. 31, 2014) (quoting Reed v. Ross, 468 U.S. 1, 13 (1984)).

Petitioner argues that his trial counsel provided ineffective assistance of counsel when she prevented him from testifying despite his expressed his desire to do so.[12] FAP at 44. Petitioner states that at his second preliminary hearing, there was a lot of information and testimony with which he strongly disagreed and when he asked his counsel if he could take the stand to rebut the information, she told him no, but assured him that would have the opportunity to do so at trial. Id. at 46. Petitioner states that as his trial was nearing its end, he anticipated

---

[12] Petitioner also appears to argue in his FAP that he was not informed of his constitutional right to testify by his counsel, however, Petitioner also notes in his FAP that on several occasions during pretrial proceedings, his counsel directly addressed his right to testify. FAP at 44-49. Specifically, Petitioner states that (1) at his preliminary hearing, his counsel told him to "Relax, you will be able to take the stand at trial to tell your side," (2) his counsel "reassured petitioner that he w[ould] take the stand to testify against these allegations and inconsistencies by further responding, 'it will be okay, don't worry about this, you will take the stand and fully explain all of it,'" and (3) with respect to the letter Petitioner sent to his daughter he wrote "will have to take the stand at trial to correct all of this." Id. at 47-49. Accordingly, to the extent Petitioner is arguing ineffective assistance of counsel or a Sixth Amendment violation based on a failure to advise him of his constitutional right to testify, the Court **RECOMMENDS** that the claim be **DENIED**.

that he would be testifying and was surprised to hear his counsel state "we rest." Id. at 49. Petitioner questioned his attorney as to why he was not testifying, and she responded that because of his prior DUI conviction, it was not a good idea for him to testify. Id. Petitioner states that he informed his attorney that he did not have a previous DUI and that she should demand proof from the prosecutor, but she responded that he could not testify and that if he chose to do so, she would no longer represent him. Id. at 50. Counsel also told Petitioner that the jury was unlikely to listen to Petitioner's testimony and that he would only end up alienating the jury. Id. Petitioner argues that had his counsel informed him of his right to testify and permitted him to do so, he would have truthfully testified as to what happened the evening of the accident and clarified the incorrect testimony that had been provided by other witnesses. Id. at 50-56. Specifically, Petitioner states that he would have testified that (1) his customer dropped him off in his car at his ex-wife's house where he consumed two twelve-ounce beers and a double shot of tequila and where he told his daughter that he or someone else would die if he drove right then - at approximately 4:00 pm - when he was beginning to feel the effects of the alcohol, as opposed to when he left the house hours later, (2) his customer was driving his car when he left his ex-wife's house and that he did not have his car keys to give to his daughter when she asked because he was not driving, (3) he accidentally bumped into his daughter's neighbors when he left the house and said excuse me, (4) he was sitting in the driver's seat when his son saw him because he was retrieving a cell phone charger, not because he was driving at that time, and (5) he did not begin driving again until after a visit to McDonalds around 11:30 p.m. when he drove to AM/PM. Id. at 51-56. Petitioner further argues that at his evidentiary hearing regarding his counsel's failure to investigate, it was revealed that he did not have a prior DUI conviction at the time of his trial making his counsel's refusal to allow him to testify even more egregious. Id. at 56-57.

Here, the record supports the court of appeal's finding that Petitioner failed to make a prima facie showing of ineffective assistance of counsel due to his counsel preventing his testimony. Lodgment 21 at 1-2. Petitioner does not present any evidence or identify any trial transcript supporting his claim that he wanted to testify, that his lawyer prevented him from

doing so, and that he affirmatively notified the court of his desire to testify. Lodgment 35 at 1029. After defense counsel stated that the defense rests, there is no indication in the record that Petitioner protested or sought permission from the Court to testify despite the fact that he was present in the courtroom. Id. Accordingly, it can be inferred that Petitioner knowingly waived his right to testify. See Torres, 2015 WL 5813340, at *4 (citing U.S. v. Gillenwater, 717 F.3d 1070, 1080 (9th Cir. 2013) (court can infer that a defendant has personally waived the right to testify when defense counsel elects not to call the defendant and, despite being present, the defendant takes no affirmative action to demonstrate his disagreement with counsel).

Additionally, the record supports the court of appeal's finding that Petitioner did not make a prima facie showing that he suffered prejudice as a result of his counsel's alleged ineffectiveness as much of the information Petitioner argues that he would have testified about does not differ significantly from the evidence that was presented at trial. For example, Ms. Shacreaw testified that she gave Petitioner a double shot of tequila and one beer, less than what Petitioner argues he would have testified to. Lodgment 35 at 351; see also FAP at 51-52. Ms. Shacreaw also attempted to correct her previous statements to investigators and testified that Petitioner's comment about somebody dying if he drove was not made when he was leaving the home, but occurred about an hour and a half before he left. Id. at 399. She further testified that Petitioner "ran into the old couple" (her neighbors), but did not push them. Id. at 386-387. In her closing argument, Petitioner's counsel also raised the issue of the McDonald's bag that was found in Petitioner's car by arguing that Petitioner was feeling good enough to eat and drive which may have been incorrect, but which spoke to his mental state at the time of the accident. Id. at 1132.[13] Given that the jury heard much of this testimony and still found there was sufficient evidence to convict Petitioner, Petitioner has not shown that there is a reasonable likelihood that the outcome of his case would have been different had his counsel "permitted"

---

[13] In the government's rebuttal argument, counsel responded that counsel for Petitioner's argument regarding the McDonald's bag was not supported by any evidence or witness. Lodgment 35 at 1159.

him to testify.

The Court acknowledges that some of the testimony Petitioner contends he would have provided did not come out at trial. The jury did not hear testimony that Petitioner's customer was driving Petitioner's car when he left the Gold home or that he was sitting in the driver's seat of the car when his son saw him because he was looking for a cell phone charger, not because he was operating the car.[14] However, the fact that these contentions were not presented to the jury alone does not demonstrate that Petitioner was prejudiced or that the testimony would have led to a different result in light of all of the other testimony heard by the jury. The jury may have found Petitioner's version of events to be unconvincing and found the conflicting evidence and testimony to be more credible. Moreover, as discussed at length in the prior sections, even if Petitioner's customer drove after they left Ms. Gold's home until the McDonalds stop and even if Petitioner ate food and drank coffee, there still was overwhelming evidence supporting the jury's verdict as Petitioner knew the dangers of drinking and driving, knew he had drank too much earlier in the day, drove recklessly and at high rates of speed causing a fatal accident, and had a blood alcohol level exceeding .10% at the time of the accident. Given all of the evidence, Petitioner has not satisfied the prejudice prong of the <u>Strickland</u> test as there is not a reasonable likelihood the trial outcome would have been different even if counsel had investigated and presented the described evidence.

Accordingly, the state court's analysis and decision denying the ineffective assistance of counsel claim is not "contrary to or an unreasonable application of Federal law" or based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). For these reasons, this Court **RECOMMENDS** that Petitioner's Petition be **DENIED** on this

---

[14] In her closing argument, Petitioner's counsel recounted a letter that Petitioner wrote to his daughter, Ms. Shacreaw, after her interviews with the District Attorney and investigator and before trial in which Petitioner said that he left Ms. Gold's house at 9:30 p.m. "got in [his] car and drove home" where he spoke with his fiancé on the phone and gave his son Nick cigarettes until 10:50 p.m. when "[he] left [his] house to go down to San Diego." Lodgment 35 at 1147. There was no mention of Petitioner's customer, McDonald's or AM/PM in the closing argument discussing Petitioner's letter. <u>Id.</u>

14cv1284-GPC(BLM)

1  ground.

2  **E.     Sixth Amendment Right to a Speedy Trial**

3          In his next claim, Petitioner alleges that his Sixth Amendment right to a speedy trial was

4  violated "when the preliminary hearing judge failed to complete the hearing in one-session by

5  failing to deem the complaint an[d] information [u]ntil[] 26 days later without a waiver or

6  affidavit while petitioner sat in custody." FAP at 39. Petitioner further alleges that his "due

7  process rights were violated when structural error occurred in petitioner[']s case when the

8  District Attorney failed to file the information within the statutory 15 day time line of the holding

9  order." FAP at 42. Respondent contends that Petitioner's claims should be summarily rejected

10 because they are challenges to state laws for which habeas relief is unavailable and are factually

11 belied by the record. Answer at 19.

12          Petitioner presented his claims to the California Superior Court in two different petitions

13 for writ of habeas corpus, in a petition to the California Court of Appeal, Fourth Appellate District

14 and in a petition before the California Supreme Court.[15] Lodgments 10, 14[16], 26, and 30. The

15 claim was summarily denied by the California Supreme Court [see Lodgment 31] so this Court

16 must "look through" to the California Court of Appeal's decision, which rejected Petitioner's

17 claim. Ylst, 501 U.S. at 801–806. The Court of Appeal also summarily denied Petitioner's habeas

18

19  —————————————————

20 [15] Petitioner also presented his claim to the California Court of Appeal, Fourth Appellate District
   in the context of his ineffective assistance of counsel claim arguing that his trial counsel rendered
21 ineffective assistance of counsel by failing to object when the magistrate continued the
   preliminary hearing without an "Affidavit of Good Cause" or a valid waiver. Lodgment 20. The
22 appellate court denied the petition finding that Petitioner failed to show that he sought relief
   from the superior court on the claims and that he failed to show "(1) why his trial counsel failed
23 to make such a challenge, (2) that there could be no satisfactory explanation for counsel's failure
   to object, or (3) that he would have obtained a more favorable result absent her conduct."
24 Lodgment 21. Petitioner's instant claims regarding his speedy trial and filing of the information
   do not appear to be linked to an ineffective assistance of counsel claim. FAP.
25

26 [16] The petition was attached as an exhibit to Petitioner's motion to file an amended petition in
27 the Superior Court of California and it is unclear if Petitioner's motion was granted or denied.
   Lodgment 14.

28

and stated that it would not consider a repeat application for habeas corpus presenting a claim that was previously rejected and cited to In Re Clark, (1993) 5 Cal. 4th 750, 767. Lodgment 27. The California Superior Court concluded:

> In the initial Petition, Romero asserted his Due Process and statutory rights were violated when the People failed to file an information within 15 days of his preliminary examination. This appears to be his primary argument in his Amended Petition, though he also reiterates the other points raised in his initial Petition. Romero relies on Penal Code § 739 which states in relevant part: "When a defendant has been examined and committed, as provided in Section 872, it shall be the duty of the district attorney of the county in which the offense is triable to file in the superior court of that county within 15 days after the commitment, an information against the defendant ..." Petitioner also relies on Ciaccio v. Superior Court (1984) 156 Cal.App.3d 130 which found that counsel's mute acquiescence in the arraignment date chosen by the magistrate did not constitute a waiver of petitioners' statutory speedy trial rights.[17]

> However, this case can easily be distinguished from Ciaccio in which Petitioner brought a 995 motion raising this issue. This case is much more similar to People v. McGhee (1987) 193 Cal.App.3d 1333 in which the Court found "We find the facts here support such a finding of waiver. Not only did defendant wait 14 months to bring the motion, but it was not brought until the first day of trial. Other facts also support this finding. For example, defendant was *held to answer* to the *indictment*. At his arraignment, which counsel knew had to be scheduled within 15 days of the holding order, defendant pled *not guilty* to the charges in the *indictment*." People v. McGhee (1987) 193 Cal.App.3d at 1344. In this case Petitioner stipulated on the record to a continuance of his arraignment past the 15 days. Further, he has already been tried and had his appeal heard. It has been two and a half years since the information was filed. As such, Petitioner has waived any objection to claims a violation of his statutory rights pursuant to Penal Code§ 739.[18]

> Petitioner has filed some additional exhibits which he claims supports his allegation that his Due Process rights were violated when the People failed to file an information within 15 days of his preliminary examination. However, these documents do not change the Court's initial determination that Petitioner has

---

[17] With the exception of the first two sentences which vary slightly, this paragraph appears in both Lodgment 11 (Order dated December 4, 2013) and Lodgment 16 (order dated May 29, 2014).

[18] This paragraph appears in both Lodgment 11 (Order dated December 4, 2013) and Lodgment 16 (order dated May 29, 2014).

14cv1284-GPC(BLM)

waived his objection to these claims: Petitioner has failed to make a prima facie statement of specific facts which, if established, would entitle him to habeas corpus relief under existing law. In re Hochberg (1970) 2 Cal.3d 870, 875 fn 4.[19]

Lodgment 11 at 2; see also Lodgment 16 at 2-3.

Here, the court held a preliminary hearing on May 6, 2011. FAP at 43; see also Lodgment 34 at 343-344. At the conclusion of that hearing, the court ordered that Petitioner be "held to answer" and then inquired as to whether or not Petitioner wanted to be arraigned at that moment or later so that his counsel could decide what to do with the bind over. FAP at Exh. 14 at 233; see also Answer at 20 and Traverse at 9-10. The inquiry and response were as follows:

> Do we want to do an arraignment on this later, or -- so you can decide what you want to do with the bind over, or do you want to do it now?
>
> MS. CANNON: No, that would be good. I'm on vacation starting the minute this is over until the end of May, so if we could, have an arraignment either May 31st or June 2nd, that would be great.
>
> THE COURT: Let's do June 2nd. What's his demand arraignment date?
>
> THE CLERK: I think it's 10 days from today.
>
> THE COURT: So you have a right to be arraigned on the 16th of May. Do you want to give that up and we'll arraign you on June the 2nd at 8:30 in this department?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And you join?
>
> MS. CANNON: I do.
>
> THE COURT: Okay.

FAP at Exh. 14 at 233-234; see also Answer at 20 and Reply at 9-10. Petitioner was arraigned on June 2, 2011 and the complaint was deemed to be the information. Lodgment 34 at 345.

Petitioner states that this habeas claim is based on violations of "California State law governing preliminary hearings and speedy trial rights covered under the U.S. Constitution" and

---

[19] This paragraph appears in Lodgment 16 (order dated May 29, 2014).

"violation of California law of Penal Code §1382(a)(1)[20]." FAP at 39. To the extent Petitioner's claim relies on alleged violations of California state law, including Penal Code § 1382(a)(1), the claim is not cognizable in federal habeas review. Federal habeas relief only is available for violations of federal law, not state law. See Reynolds, 2017 WL 3841786, at *10 ("a claim for federal habeas relief cannot be premised on a violation of the California speedy trial statute.") (citing King v. Cash, 2014 WL 3818296, at *14 (S.D. Cal. Aug. 4, 2014) (violation of state's speedy trial statute not cognizable on federal habeas review); Medina v. Beard, 2014 WL 6460513, at *21 (C.D. Cal. Nov. 14, 2014) (same)); see also Estelle, 502 U.S. at 68 (A federal habeas court cannot interfere with a state court's interpretation of state law and may not "reexamine state-court determinations on state-law questions."); and Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

To the extent Petitioner is claiming that his federal constitutional rights were violated, he fails to state a claim for habeas relief. Criminal defendants are guaranteed a speedy trial by the Sixth Amendment to the Constitution. Barker v. Wingo, 407 U.S. 514, 515 (1972). The right to a speedy trial is fundamental and is imposed by the Due Process Clause of the Fourteenth Amendment on the States. Id. "Determining when a delay violates the Constitution involves 'a balancing test, in which the conduct of both the prosecution and the defendant are weighed.'" Reynolds v. McDonald, 2017 WL 3841786, at *9 (C.D. Cal. June 1, 2017) (quoting Barker, 407 U.S. at 530). The four factors to be considered are: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) whether the defendant was prejudiced by the delay. Id. (quoting Barker, 407 U.S. at 530). The delay must be long enough to trigger an analysis into the other three factors. Id. (citing Barker, 407 U.S. at 530). Generally, a delay of a year or more between accusation and trial is considered

---

[20] California Penal Code § 1382(a)(1) states:

> (a) The court, unless good cause to the contrary is shown, shall order the action to be dismissed in the following cases: (1) When a person has been held to answer for a public offense and an information is not filed against that person within 15 days.

presumptively prejudicial, or long enough to trigger the <u>Barker</u> inquiry. <u>Id.</u> (citing <u>Doggett v. United States</u>, 505 U.S. 647, 652 n.1 (1992)).

Initially, Petitioner is not alleging that his trial was delayed; he is alleging that his arraignment was delayed. Petitioner provides no law to support his assertion that this type of delay violates the Sixth Amendment. Even if a delay in arraignment could establish a constitutional violation, the facts of this case do not support it as all four of the <u>Barker</u> factors favor a finding of no violation. First, the challenged delay is less than three weeks so it is not presumptively prejudicial and does not trigger a <u>Barker</u> inquiry. Second, the delay was to accommodate defense counsel's schedule. Third, Petitioner agreed to the delay and did not assert his constitutional right to a speedy trial. Fourth, Petitioner has not established any prejudice caused by this short delay. As noted by the state court, Petitioner did not raise this challenge until almost two and a half years after Petitioner was arraigned on the information and after his trial was completed and his direct appeal was heard. Lodgment 11 at 2. Accordingly, the Court **RECOMMENDS** that Petitioner's petition for relief be **DENIED** on this ground.

## F. <u>Actual Innocence</u>

Petitioner's sixth and final claim alleges that the facts he has presented make a colorable showing of actual innocence as the constitutional violations that he has described "probably caused his conviction even though he is innocent of the crimes for which he was charged and convicted of." FAP at 58. Respondent contends that Petitioner's claim of actual innocence should be summarily rejected. Answer at 23.

Petitioner raised this claim in a petition for writ of habeas corpus in the Superior Court of California, County of San Diego, in petitions in front of the California Court of Appeal, Fourth Appellate District, and in a petition before the California Supreme Court. Lodgments 18, 20, 26, and 30. The claim was summarily denied by the California Supreme Court so this Court must "look through" to the California Court of Appeal's decision, which rejected Petitioner's claim. <u>Ylst</u>, 501 U.S. at 801–806; <u>see also</u> Lodgment 31. The Court of Appeal denied Petitioner's habeas petition by simply stating that it would not consider a repeat application for habeas

corpus presenting a claim that was previously rejected and cited to <u>In Re Clark</u>, (1993) 5 Cal. 4th 750, 767.[21]  Lodgment 27.

The Supreme Court has not established the existence of a freestanding actual-innocence claim on federal review of a non-capital habeas case.[22]  <u>See</u> <u>Toney v. Sandor</u>, 2012 WL 8023753, at *5 (S.D. Cal. Oct. 26, 2012) (citing <u>District Attorney's Office for Third Judicial District v. Osborne</u>, 557 U.S. 52, (2009) (whether federal constitutional right to be released upon proof of "actual innocence" exists "is an open question")).  If such a claim exists, a petitioner would have to meet an "extraordinarily high" and "truly persuasive" showing in order to establish he was actually innocent of the charges of which he was convicted. <u>Poizner v. Frauenheim</u>, 2015 WL 9094128, at *10 (S.D. Cal. Dec. 15, 2015) (citing <u>Herrera v. Collins</u>, 506 U.S. 390, 400-17 (1993).  A petitioner must offer new, reliable evidence of an alleged constitutional error that probably resulted in the conviction of an innocent person.  <u>See</u> <u>Rivera v. Montgomery</u>, 2014 WL 7183669, at *13 (S.D. Cal. Dec. 16, 2014) (citing <u>Schlup</u>, 513 U.S. at 324, 327).  A petitioner's claim of actual innocence must be supported "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was not presented at trial." <u>Id.</u> (quoting <u>Schlup</u>, 513 U.S. at 324).  This evidence must be factual and indicate actual innocence, "as opposed to legal innocence as a result of legal error." <u>Gandarela v. Johnson</u>, 286 F.3d 1080, 1085 (9th Cir.2001) (citing S<u>chlup</u>, 513 U.S. at 321).  To establish actual innocence, a petitioner must demonstrate that, in light of all the evidence, "it is more likely than not that no reasonable juror would have convicted him." <u>Tryals v. United States</u>, 2017 WL 3438558, at *8 (S.D. Cal. Aug. 9, 2017) (quoting <u>Schlup</u>, 513 U.S at 327 (1995)).

---

[21] The first petition Petitioner presented to the Court of Appeal was not decided on the merits. <u>See</u> Lodgment 21 ("Romero's petition suffers from fatal procedural defects. First, he has not shown that he has sought relief from the superior court in the first instance on these claims").

[22] However, a petitioner whose petition for habeas corpus is procedurally barred may still obtain consideration of the merits of his petition if he can establish "actual innocence."  <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 314 (1995). This doctrine is not applicable to the instant case.

Petitioner fails to establish that he is entitled to habeas relief due to actual innocence.  As an initial matter, because the Supreme Court has never held that a free-standing actual innocence claim exists, the denial of such a claim by the state court cannot be contrary to, or an unreasonable application of, clearly established Supreme Court law. See Poizner, 2015 WL 9094128, at *10 (finding that "because the Supreme Court has never squarely held that a free-standing actual innocence claim exists, the state court's denial of such a claim cannot be contrary to, or an unreasonable application of, clearly established Supreme Court law") (citing Carey v. Musladin, 549 U.S. 70, 77 (2006); Knowles v. Mirzayance, 556 U.S. 111, 122 (2009); and Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006) (finding that when the Supreme Court has expressly stated that whether a particular claim exists is an open question, the state court cannot be said to have acted in an objectively unreasonable manner by denying that claim)).  Second, Petitioner has failed to provide any "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324.  Third, as discussed above, there is ample evidence supporting the jury's guilty verdict which negates Petitioner's claim to actual innocence.

For these reasons, this Court finds Petitioner's claim of actual innocence to be without merit and **RECOMMENDS** that Petitioner's Petition be **DENIED** on this ground.

## CONCLUSION

For the foregoing reasons**, IT IS HEREBY RECOMMENDED** that the District Judge issue an Order approving and adopting this Report and Recommendation denying the Petition for Writ of Habeas Corpus.

**IT IS ORDERED** that no later than, **June 29, 2018**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

///

///

///

///

14cv1284-GPC(BLM)

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than, **July 20, 2018**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED**.

Dated:  5/30/2018

Hon. Barbara L. Major
United States Magistrate Judge